## Rolland *versus* The Commonwealth.

1. To open the inner door of a dwelling house, at night, with the intent to commit a felony in the house, is an *actual breaking* and will sustain an indictment for burglary, and it matters not whether the felony is to be committed in the particular room into which this inner door opens, or in another part of the house.

2. Per PAXSON, J.: We do not think the Act of April 22d 1863, sect. 2, Pamph. L. 531, was intended to apply to or affect the offence of burglary at common law, but to define and punish a new offence, unknown to the common law, yet partaking of the nature of burglary, viz. : breaking and entering by day, and entering by day or by night without breaking ; and also to apply to a class of buildings which are not the subject of common law burglary, and that it was to such buildings only that the words "with or" in the Act of 1863 have reference.

June 20th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Oyer and Terminer of *Franklin county :* Of May Term .1877, No. 149.

Indictment of Ralph L. Rolland, the first count of which charged defendant with *breaking* and *entering* into a dwelling-house, &c.; and the second with *entering* without alleging a *breaking*. The first count was founded on the 135th section of the Act of 30th of March 1860, Pamph. L. 415, Purd. Dig. 352, pl. 194 ; and the second on the 2d section of the Act of 22d April 1863, Pamph. L. 531, Purd. Dig. 353, pl. 195.

The prisoner pleaded "Not guilty." The evidence produced on the trial was similar to that offered on the trial of Johnston *v.* The Commonwealth, *ante*, page 54.

Additional testimony was offered to the following effect : That upon the night of the attempted robbery of the bank when Rolland and Johnston obtained admission to the bank through Mr. Kindline, they were conducted by the latter to the cashier's room and were there left with Mr. Messersmith. It appeared by the testimony of Messersmith that when Kindline left the room, as he went out he *closed* and *latched* the door that leads from the cashier's room to the dining-room. Kindline also testified that when he left these men in the room with Messersmith he *closed* and *latched* the

[Rolland *v.* Commonwealth.]

door to the dining-room as he wnt out, as also the door leading from the dining-room into the hall. Messersmith, in his account of the struggle between himself and these men, said: "During this struggle some one fell over a chair, or a chair fell to the floor, it is impossible for me to say which. That fall was heard up-stairs, and my outcry. At this point I thought I heard my brother-in-law coming down the back stairway. Rolland released his hold upon me at that moment, opened the door of the dining-room and rushed out. Johnston released me at the same moment; he rushed out the same door and I staggered to my feet. * * * They both—Johnston following Rolland—rushed back into the dining-room, through the dining-room into the kitchen, and, I believe, out of the kitchen door. That was the last I saw of them. The door from the cashier's room into the dining-room had not been opened from the time Kindline left until Rolland opened it."

Shortly after his capture, while confined in the county jail, Rolland made statements to several parties, the substance of which is herewith detailed. To John M. Pomeroy he said:—

"His intention in coming here was to rob the National Bank, which he saw, by examining the vault and securities of the bank, could very readily be effected; sought the acquaintance of the citizens whom he thought could be made useful to his purpose; was deterred from the execution of his purpose by Messersmith's kindness, and had a difficulty in bringing his mind up to making the attack, on that account; went in company with Johnston; was disappointed in the resistance of Messersmith, and left him in charge of Johnston, supposing he would give no further trouble; left him in charge of Johnston while he went up-stairs to secure Kindline, supposing he would be entirely safe in Johnston's hands; thought Messersmith had been overcome in the struggle; in going into the entry was somewhat surprised to see Kindline coming down-stairs at so rapid a rate, and was further surprised at seeing Johnston and Messersmith, on looking around, coming in at the other end of the hall; presented a pistol at Kindline, and it had not the desired effect; found that the servants were raising an alarm and that nothing was left but to attempt to escape."

To Colonel McKnight he said: "Purpose in coming to Chambersburg was to crack or rob the bank; in conflict with Messersmith found him a more muscular man than expected; when I left him in charge of friend told him to hold Messersmith, but not to harm him; went to attend to Kindline; was surprised to find him down-stairs in the passage; made way to the front door and found it obstructed, and pointed revolver at Kindline, but did not do; found it necessary to escape."

To Mr. McIlvaine he said: "Had tried to gag Messersmith; had found him a bad customer to handle; left him, after he was subdued, in charge of his comrade, and started to go up-stairs to

quiet Kindline; was not his intention, when he left room, to escape with the $30,000 only, but to take all the funds of the bank."

To Mr. Keefer he said : " There was no use of his denying that he attempted to rob the bank; that a package belonging to the bank was found on his person. It was not the contents of that package I wanted, but to go through the bank and get all that was there. We would have succeeded, had my friend played his part. We had Messersmith down and completely intimidated. My friend wanted to kill him, and I would not let him. Murder is not my business; it is one more honorable than that. I knew Kindline was in the house and must be shut up. I told my friend to hold Messersmith, but not harm him; I must see to the front. I left Messersmith in charge of my friend, and went to the hall. When in the hall I saw Kindline, and would soon have intimidated him. I had him under cover of my pistol, when to my surprise my friend followed me quickly, with Messersmith on his heels, crying 'Murder!' I had nothing more to do than to attempt an escape, and capture was the result."

On behalf of the Commonwealth it was contended that the foregoing testimony showed a *breaking* of an inner door, and with a *felonious intent*, and that these constituted an *actual breaking*, and was such a breaking as constituted a felonious burglary.

The second point of the prisoner was as follows, to which is appended the answer of the court (Rowe, P. J.) :—

The Commonwealth has failed to show any *actual* breaking of the dwelling-house of Messersmith by the prisoner on the night of the 24th of March 1876.

Ans. " I submit to the jury, on all the evidence, the question whether an actual breaking has been proved.

" There cannot be burglary without a breaking; and the opening of a door, whether an inner or an outer door, in an effort to escape, is not a burglarious breaking. So much was decided by the Supreme Court in this case on a former trial.

" But the breaking requisite to constitute a burglary is not confined to the external parts of the house, but may be of an inner door, after the offender has entered by means of a part of the house which he has found open. Thus, if one enters a dwelling of another in the night time, the outer door being open, and when within the house, unlatches an inner door with intent to steal, this will be burglary.

" If the prisoner Rolland's design was to get the contents of the vault of the bank, and if, having succeeded, as he thought, in subduing Messersmith, so that he might safely leave him with Johnston, he unlatched and opened the door leading from the cashier's room to the dining-room, and went out thereat for the purpose, not of escaping, but of securing and quieting Kindline, and with the intention, after that should be done, of prosecuting further his de-

[Rolland v. Commonwealth.]

sign to rob the bank, with the intention of coming back to the banking-room and continuing an effort already begun to rob the bank of its moneys and valuables, then such unlatching and opening of that door was a breaking within the meaning of the law.

"But if Rolland, in unlatching and opening the door—either door—did so with the intent to escape, it would not be such a breaking as is requisite in burglary."

In their general charge, the court also said:—

"The great struggle in this case has been about the point of the breaking. The counsel for the Commonwealth has insisted that the evidence delivered before you shows a breaking as well as an entrance. The prisoner's counsel claim that it does not do so. Now, breaking is either actual or constructive. Actual, as when one unlocks or unlatches a door which is closed and enters. Constructive, where admission to the house is procured by trick or fraud. You have nothing to do with a constructive breaking in this case. I must instruct you that there can be no conviction for constructive breaking on the evidence in this case. The counsel for the Commonwealth have explicitly declined to ask such instruction, or to claim conviction on that ground, and have so notified the counsel for the prisoner and the court. We are therefore relieved from any trouble on this score. The Commonwealth rests her case on an *actual* breaking.

"Now in order to prove an actual breaking, the Commonwealth relies on the evidence of John M. Pomeroy, W. C. McKnight, Frank Keefer and John S. McIlvaine. These witnesses testify to conversations with Rolland at the jail. Pomeroy and McKnight were together, and they agree substantially in saying that Rolland said that he left Messersmith in charge of Johnston, supposing that he was overcome in the struggle and would be safe in Johnston's hands, and would give no further trouble, and that he left the room with the intention of going up-stairs to secure Kindline, and that on going into the hall he was surprised to find Kindline coming down-stairs, and on looking round, to see Johnston and Messersmith coming into the hall; that he then saw that nothing remained but to escape. To the same effect is the testimony of Keefer and McIlvaine.

"The Commonwealth relies upon the evidence of Messersmith and Kindline to show that the door was shut and latched; on the evidence of Messersmith to show that Rolland opened it; and on the four witnesses whom I have named above to prove that he went out of this room with the intention of securing, or quieting or shutting up Kindline, and that the intention to escape was only formed when he saw Messersmith follow him into the hall; and on Keefer and McIlvaine to show that after Kindline should be secured, the vault was to be robbed, and all the funds of the bank taken.

"If you believe these witnesses, and that Rolland meant to do

what he told them was his intention when he left the room of the cashier and entered the hall—that is, if you believe that the door was latched and Rolland opened it after he thought Messersmith subdued, and went out into the dining-room and thence into the hall, with the design of securing Kindline, and after that of proceeding to rob the bank, then such unlatching of the door was a burglarious breaking, and he may be convicted on the first count of the indictment.   If he is, he will be condemned out of his own mouth, for without the declarations made by him at the jail to the four witnesses, who speak as to them, there would be no evidence of an actual breaking."

The verdict was " guilty in the manner and form indicted," and a motion for a new trial having been overruled, the prisoner was sentenced to an imprisonment of eight years in solitary confinement at labor.

He then took this writ, assigning for error the answer of the court to his second point and the portion of the charge noted.

*Duncan & McGowan* and *J. McDowell Sharpe*, for the plaintiff in error.—A careful examination of the authorities shows conclusively that in every case where the opening of an inner door and passing through it have been held a sufficient breaking in law to constitute burglary, the intention to commit a felony in the very room into which such entrance was effected was clearly present, and constituted the very essence of the offence : Edmond's case, Hutton 20 ; 1 Hawk. P. C. 102 ; Rex *v.* Gray, 1 Strange 481, 2 East P. C. 488 ; State *v.* Wilson, 1 Coxe (N. J. L.) 441 ; U. S. *v.* Brown, 4 Cranch 604 ; State *v.* Henry, 9 Ired. 471.

The facts assumed in our case show that Rolland, when he unlatched the doors and passed through them, had no immediate purpose of committing a felony in the room or place to which the doors led, but that in fact he was going away from the banking-room, which was the theatre in which his plot to rob the bank was to be enacted, if he had any such plot at all.

We submit, then, that the learned judge was in error in ruling, that if the jury believed the facts assumed to be proved by the Commonwealth, Rolland was guilty of an actual breaking.

The error is still more manifest, when, under the facts of this case, the court charged the jury that there was an *actual breaking* under the Pennsylvania Criminal Code, and the Act of April 22d 1863, which were intended to provide for an offence where the entering is by night, without breaking, and which apply to this case.

*O. C. Bowers*, District Attorney, and *John Stewart*, for the Commonwealth.—We have here a breaking and entering of a certain part of the dwelling-house in the night time for the purpose of doing an act in the furtherance of the general design to steal, and

it indeed seems idle to undertake to say that it was not done with intent to commit a felony.    With what intention was it done if not with that one ?

It is of no consequence that Rolland was going out and away from the banking-room, which was to have been the theatre in which his original plot was to be enacted, when he opened the dining-room door and started for Kindline.

He was not breaking and going out, but he was breaking and entering that portion of the house in which he knew Mr. Kindline to be, for the very purpose of taking a second necessary step in the accomplishment of his design, that is, for the purpose of committing a felony.    State v. Wilson, 1 Coxe (N. J. L.) 441, is an analogous case.

Mr. Justice PAXSON delivered the opinion of the court, October 1st 1877.

This record presents but a single question.   Was there such a breaking as constitutes felonious burglary ?   That the opening of an inner door may be such breaking is too well settled to need discussion. If a person leaves his doors or windows open, it is his own folly and negligence, and if a man enters therein it is no burglary ; yet if he afterwards unlocks an inner or chamber door it is so : Sharswood's Blackstone, vol. 2, p. 226.   The same rule is asserted in Wharton's Criminal Law, vol. 2, § 1536 ; 1 Bishop's Cr. Law 308 ; Roscoe, p. 302, and numerous authorities cited in which the point has been decided.    It was conceded at bar that the law is so, but it was contended that in the case of the opening of an inner door, it must be accompanied with an intent to commit a felony in the very room so entered.   We do not assent to this qualification of the common-law rule. If a burglar, entering by an outer door or window, incautiously left open, with the intent to commit a felony in a particular room in the house, as if he intends to rob a safe with the location of which he is familiar, and in furtherance of his design, and to enable him to accomplish it successfully, opens the door of the adjoining room in the same house to gag and bind the owner sleeping therein, it is a breaking within the meaning of the law defining the offence of burglary.    Yet in such case there would be an entire absence of an intent to commit a felony in the bed-room.    The binding of the owner, standing alone, would be a mere assault and battery, punishable as a misdemeanor.    Taken in connection with the main object it assumes a different character, and becomes a necessary incident of the felony, as much so as the lifting of a latch or the breaking of the door of the safe.   The true test, as applied to an inner door of a house, is whether it was opened in the perpetration of or attempt to perpetrate the felony.   If it was a necessary act in the perpetration of the felonious design, it can make no difference that the felony was to be committed in an adjoining room.

There may be cases in which the qualification referred to would apply, as in the case of a lodger at an inn who intends to commit a felony in another room in the same house. But if such qualification exists in any case, we fail to see its application to the facts of the case at bar. We will not strain the law to meet a particular case, nor will we refine it away in the interest of burglars. We think the court below submitted the question of intention fairly to the jury. They were told that if the prisoner opened the door for the purpose of escaping, he could not be convicted of burglary; but if it was done in furtherance of a design to commit a felony in the house, the offence was complete. This ruling was clearly correct.

Our attention was called to the Act of 22d of April 1863, Pamph. L. 531, and it was urged that the second section of said act was intended to meet such cases as this: that is, where there is an entering without the breaking of an outer door, but the opening of an inner door with intent to commit a felony. In Rolland *v.* The Commonwealth, 1 Norris 306, we endeavored to make the meaning of this act plain and to reconcile it with the 135th section of the Act of 31st of March 1860, Pamph. L. 415. I will repeat now what was said at greater length in that case: that we do not think the Act of 1863 was intended to apply to or affect the offence of burglary at common law, but to define and punish a new offence, unknown to the common law, yet partaking of the nature of burglary, viz.: breaking and entering by day and entering by day or by night without breaking; and also to apply to a class of buildings which are not the subject of common-law burglary, and that it was to such buildings only that the words " with or" in the Act of 1863 have reference. We cannot make this subject any clearer. There is an admitted obscurity in the sections referred to, and a necessity for such a construction as would reconcile their seeming repugnancy. We could not assume it to have been the legislative intent to abolish the offence of burglary. In the case before us, the offence of common-law burglary was complete, and the provisions of the Act of 22d April 1863 have no application.

The judgment is affirmed.